UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
UNITED STATES OF AMERICA           Hon. Roslynn R. Mauskopf
                                   U.S. District Judge
   -against-
                                   Docket No. 10-CR-493(RRM)
GILBERT NOBLE
                                   SENTENCING
   Defendant.                      MEMORANDUM
-------------------------------------------------X

### DEFENDANT'S REPLY SENTENCING MEMORANDUM

MARC AGNIFILO, ESQ.
Of Counsel
Brafman & Associates, P.C.
767 Third Avenue
New York, New York  10017
(212) 750-7800
Magnifilo@braflaw.com

Defendant Gilbert Noble submits this brief memorandum in reply to the Government's response. After reviewing the defendant's sentencing memorandum and the Government's response, the Court may conclude that there are two primary issues in determining what an appropriate punishment shall be for this conduct. First, what role the defendant played in the scheme – in other words, was he the ultimate mastermind, as the Government contends, or was he merely acting at the direction of the person identified by him as Raymond King, and is therefore no more culpable than the others involved in this conduct? Second, what was the amount of money the defendant and the others were looking to remove from the Weller brokerage account – was it the sum of $6,000,000, as contended by the Government, or was it the sum that was actually removed from the account, $94,753? There are certainly other issues the Court will consider in arriving at an appropriate sentence, but these are two of the most central considerations to the defendant's culpability and how the guidelines are to be applied.

Regarding the Guidelines, if the Court concludes that the Government has not established that the loss figure should be calculated at $6,000,000, and that instead, the loss amount is $94,753, then the base offense of 7 would be increased by only 8 levels, instead of the 18 levels argued by the Government. Also, if the Court credits the defendant's assertion that he was acting at the behest and direction of Raymond King, then the Court is asked to not apply the two level enhancement for an aggravating role in the offense. The resulting adjusted offense level would be a level 13, instead of a level 25, which provides for a Zone C sentence of between 12 and 18 months.

In settling these two sentencing issues, the Court is respectfully asked to take note of several facts. First, on the issue of loss, that a total of $94,753 was actually transferred

1

from the Weller brokerage account to the attorney escrow account of the cooperating witness, Akin Ayorinde. Second, that the contract and the contract amount of $6,000,000 were created by David Sayegh, and not by Noble, as part of Sayegh's ongoing criminal conduct with Ayorinde having nothing to do with Noble. Third, as to the issue of role, that Noble proffered and afterward identified Raymond King to the FBI from an FBI photo book. These facts will be reviewed briefly below.

1. The Scheme Resulted in $94,753 Being Transferred

There is no doubt that the only money actually transferred as part of the scheme was $94,753 which was removed from the Weller account and transferred to the attorney escrow account of the cooperating witness, Akin Ayorinde, on March 25, 2010. Therefore, there is a strong argument that the loss calculation should reflect this amount, rather than the $6,000,000 figure credited by the Probation Department and the Government. The Government attempts to de-emphasize the amount of money actually sent as a "test run." However, there is no evidence at all to support the claim that the $94,753 that was actually sent was merely a test run. Rather, the only evidence is that the $94,753 figure, hardly the type of sum to be used as a "test run," was itself the theft.

Simply put, this is the money the co-conspirators intending to steal. There was no second attempt to transfer money and there was no clear plan to steal more money than this amount. While the conspirators certainly had conversations about stealing more, as noted below, this was a clear attempt to convince Ayorinde to cooperate with the others and not himself take the money being sent into his account to the exclusion of Noble.

Therefore, the Court is asked to focus on the amount of money actually transferred and, most respectfully, not speculate on events that simply never took place.

### 2. The $6,000,000 Figure In The Contract Is Not Dispositive of Noble's Intent

The Government relies largely on the contract to establish Noble's intent to steal $6,000,000. However, it is clear from the conversations on tape that this contract was something that David Sayegh drafted based on a prior scheme that Sayegh ran with Akin Ayorinde, having nothing to do with Noble. In particular, Ayorinde is recorded chastising Sayegh for being sloppy and for failing to eliminate the names of other individuals that were already in the contract. It is clear that Sayegh had used a prior contract that he had presumably drafted and was on his computer, and that he had failed to change the names in the old contract to fit the new scheme that he was now undertaking with Noble and Ayorinde. On tape, Ayorinde complains to Sayegh that he left names on the contract having nothing to do with this deal.

The reason this is important is because Noble did not draft these contracts and was not the one who put the dollar figure in the contract. It is true that Noble, like Ayorinde, told Sayegh to change certain names in the contract. But, the dollar amount was something that Ayorinde and Sayegh came up with on their own.

Also, there is no evidence that defendant Noble had any role in faxing this document. In fact, based on recorded conversations between Sayegh and Ayorinde, it is clear that Sayegh prepared this document and faxed it to Ayorinde on or before March 4, 2010.

3

That David Sayegh and Akin Ayorinde may have created these contracts on their own is all the more likely given the fact that the two have committed numerous substantial fraud offenses with each other prior to the facts of the instant case, and prior to either of them meeting Noble.[1] The recordings recently received[2] and reviewed reveal that Sayegh and Ayorinde had engaged in fraudulent conduct involving multiple hundreds of thousands of dollars with numerous other individuals who were explicitly identified by first and last name by both Sayegh and Ayorinde during the recorded conversations. These conversations also show that defendant Noble had no previous relationship with either Sayegh or Ayorinde, that Noble met Sayegh through Frank Bauco, who has not been charged, and that through Sayegh, Noble met Sayegh's long-time lawyer, Ayorinde.

The prior criminal relationship between Sayegh and Ayorinde is also significant because Noble would have had every reason to be concerned that Ayroinde would cut Noble out of the scheme and either keep the money for himself or share it only with Sayegh. As reflected in the tape recordings, Noble sought to prevent this from occurring in several ways. First, he sought to convince Ayorinde that the first money transfer of $94,753 was a small fraction of the total amount that would be coming. This was a way of persuading Ayorinde to not make off with the money or to send it to Ayorinde's native Nigeria, where it would be inaccessible. Simply put, so long as Ayorinde believed that more money was coming, he would continue to participate in the

---

[1] Since Ayorinde is a cooperator, the Government may actually know what other crimes Ayorinde and Sayegh committed. This is information that the defendant is simply unable to learn.

[2] Counsel does not dispute the Government's assertion that the recordings between Sayegh and Ayorinde had been provided to prior counsel. However, counsel continues to maintain that he did not have these important recordings and only received them on November 7, 2011 after reading the Government's responsive letter and requesting these recordings from the Government.

conspiracy along with the others. Second, Noble went so far as to suggest that members of organized crime were involved in the scheme, a clear fabrication. During a conversation with Ayorinde, Noble said that some of the people involved are "connected" and part of an "organized situation." As this is unquestionably false, the issue arises of why Noble would say such a thing. The answer is obvious: he wanted to convince, persuade or scare Ayorinde into remaining in the conspiracy rather than himself stealing the stolen money. Third, Noble wanted to convince Ayorinde that he (Noble) was experienced and proficient in schemes of this type and that if Ayorinde had designs on stealing the money, Noble would somehow have the knowledge and ability to prevent him from doing so. The truth is that Noble has no background in schemes of this type, or indeed, more generally, in sophisticated financial matters but that Noble said these things because he did not trust Ayorinde, whom he did not know aside being the lawyer for Sayegh, whom he also did not know. Finally, based on the yelling matches and the mutual contempt between Sayegh and Ayorinde in their taped conversations, it is hard to imagine that Sayegh would portray Ayorinde to Noble as trustworthy. Instead, Noble had every reason to not trust Ayorinde, and it is apparent from the tapes that he did not trust him, and therefore sought to have some control over Ayorinde so that he would not make off with the money.

3. Defendant's Contention That He Was Acting Pursuant To Directions From Raymond King Is Bolstered By The Fact That Defendant Identified <u>The Person Known To Him As King From An FBI Photo Book</u>

There is no doubt that Noble gave a detailed factual proffer to the Government, which the Government apparently did not credit, and that even after the proffer, Noble

5

was invited to the FBI office and identified a photo of the person known to him as Raymond King from an FBI photo book. It appears, therefore, that the Government knows the true identity of the person identified by Noble in the photo book. It bears noting that yet another person, Roger Hernandez, met King several times and can also identify him. However, to Noble's knowledge, the Government has chosen to not pursue this important investigative lead. Instead, for reasons only known to the Government, the Government chooses to view Raymond King as a figment of Noble's imagination and, despite the fact that his photo is in an FBI photo book, the Government pretends as if this identification never happened.

    The significance of Noble's information and identification of the photograph of the person known to him as King is not to impugn the Government's motives or methods, but to bolster Noble's story that King in fact existed and that he was the originator of this scheme. Certainly, by falsely identifying someone as being involved in this scheme, Noble's misstatements would be easily disprovable. After all, Noble is placing King at certain locations at certain times. If Noble were to pick a photograph at random and falsely identify the person in the photo as being involved in these actions, Noble would have to know that his falsehoods would be readily established. If he were making up a false story, he would not identify a real person and tell the agents that this person was involved. But, Noble states that after the proffer, when he was invited to the FBI office to view a book of photographs, he viewed King's photo in the number one position of the book and identified him for the agents.

    As noted in the defendant's original sentencing memorandum, without knowing he was on tape, Noble repeatedly referenced his partner and stated that his partner was

the one who had contacts in the brokerage business and was the prime mover of the scheme to take Weller's money. Noble would have no reason to fabricate these facts on audio tape just as he has no reason to do so to the FBI. Rather, Noble referred to his partner and told the FBI who his partner was because this information is true.

The Court is asked to refrain from giving Noble the two level role increase encouraged by the Government and the Probation Office.

4. Conclusion

For these reasons, the Court is asked to give defendant Noble a reasonable sentence under the provisions of Title 18, United States Code, Section 3553(a) and the U.S. Sentencing Guidelines.

Marc Agnifilo
Of Counsel
Brafman & Associates, P.C.
767 Third Avenue
New York, New York  10038
(212) 750-7800

To: Clerk of Court
U.S. Attorney's Office
Probation Department